## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

**LESEAN HARDY**                                                    **PLAINTIFF**
**Reg. #10763-029**

**v.**                              **No: 2:21-cv-00009 BRW-PSH**

**UNITED STATES OF AMERICA**                                **DEFENDANT**

## PROPOSED FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following Recommendation has been sent to United States District Judge

Billy Roy Wilson. You may file written objections to all or part of this

Recommendation.  If you do so, those objections must: (1) specifically explain the

factual and/or legal basis for your objection, and (2) be received by the Clerk of this

Court within fourteen (14) days of this Recommendation. By not objecting, you may

waive the right to appeal questions of fact.

## DISPOSITION

### I.  Introduction

Plaintiff Lesean Hardy, a federal inmate incarcerated at the Forrest City

Medium Federal Correctional Institution ("Forrest City FCI"), filed this action on

January 22, 2021, asserting medical malpractice claims under the Federal Tort

Claims Act ("FTCA") (Doc. No. 1).  He alleges he suffered a knee injury on

September 15, 2019, which was initially treated with ibuprofen, ice, and instructions to keep it elevated.  Doc. No. 1 at 3.  He claims X-rays were taken the following day, and two days later, he was seen by a physician who stated he put in a request for an urgent consultation with the hospital.  *Id.* at 3-4.  Hardy claims that prison medical providers were grossly negligent because he did not receive his consultation with a specialist for 25 days, and did not receive surgery for an additional 27 days.  *Id.* at 4-6.  He claims that he suffered excruciating pain and mental anguish during this 52-day period, feared that his knee would not heal properly, and experiences ongoing pain as a result of the delay in treatment.  *Id.*

Before the Court is a motion for summary judgment, a brief in support, and a statement of facts filed by the United States (Doc. Nos. 19-21).  Although notified of his opportunity to do so (Doc. No. 23), Hardy did not file a response or separate statement of disputed facts.  Accordingly, the facts presented by the United States are deemed admitted.  *See* Local Rule 56.1(c).[1]  For the reasons described below, the United States' statement of facts, and the other pleadings and exhibits in the record,

---

[1] *See also Nw. Bank & Tr. Co. v. First Ill. Nat'l Bank*, 354 F.3d 721, 725 (8th Cir. 2003) ("Local Rule 56.1 exists to prevent a district court from engaging in the proverbial search for a needle in the haystack.).  Hardy was notified that if he responded to the defendants' motions for summary judgment, he must "also file a separate, short statement setting forth the disputed facts that he believes must be decided at trial. . . . While plaintiff is not required to file a response to the motion for summary judgment, if he does not respond, the Court can assume that the facts set out in the statement of facts are true." Doc. No. 23. !

establish that it is entitled to judgment as a matter of law and its motion for summary judgment should be granted.

## II.  Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986).  When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party.  *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002).  The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial.  *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007).  The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy.  *Id.* (citations omitted).  An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .".  Fed. R. Civ. P. 56(c)(1)(A).  A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the

absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

### III.  Undisputed Facts

The following undisputed material facts are taken from the statements of undisputed facts submitted by the United States (Doc. No. 21), the declaration of Dr. Majaraj Tomar (the "*Tomar Declaration*") (Doc. No. 21-1); the declaration of Amanda Cook (the "*Cook Declaration*") (Doc. No. 21-2); Hardy's Answers to Interrogatories (Doc. No. 21-3); Hardy's Responses to Requests for Admissions (Doc. No. 21-4); and voluminous medical records and other documentation attached to the Tomar and Cook declarations but filed under seal (Doc. No. 25).

Hardy is a 42-year-old former federal inmate. He was incarcerated at the Forrest City FCI from December 6, 2018, until he was transferred to a halfway house on March 2, 2021. *Tomar Declaration* at ¶ 4; Doc. No. 25 at 10 (Inmate History ARS). He was released via Good Conduct Time on July 29, 2021. *Tomar*

*Declaration* at ¶ 4; Doc. No. 25 at 2 (SENTRY Public Information Inmate Data).

### *Medical Treatment*

On September 15, 2019, Hardy was seen at the Forrest City FCI Health Services Unit for an injury assessment with left knee pain from an injury that occurred while playing basketball at recreation that day.  Doc. No. 25 at 14.  Hardy reported that the injury occurred when he was going for a layup, came down on the left leg, and fell.  *Id.*  He stated that his knee was swollen and painful, and rated his pain as ten out of ten.  *Id.*  The treating clinician observed no visible swelling of the left knee and reported that the patella was moveable.  *Id.* at 15.  It was noted that Hardy already had been wearing a knee brace to the left knee, but he denied any previous injuries to the knee. *Id.*  He reported some tenderness to the medial side of the patella.  *Id.*

Upon exam, the pre-existing knee brace was removed and Hardy's knee was wrapped with an ace wrap.  Doc. No. 25 at 15.  He was able to bear weight on the left leg.  *Id.*  Hardy was given crutches and was instructed on their use.  *Id.*  Hardy stated he did not think he needed crutches; however, the clinician advised Hardy to use them.  *Id.*  The clinician educated Hardy on taking weight off the left leg by using crutches, and advised him to use the Rest, Ice, Compression, and Elevation ("RICE") treatment to reduce pain and swelling. *Id.* Specifically, Hardy was instructed to rest the left leg, apply ice four times a day for 20 minutes on and 20

minutes off for the first 24-48 hours, keep his knee wrapped with the ace wrap, and elevate his leg as much as possible. *Id.* Hardy was given a medical idle status with athletic restrictions. *Id.* The clinician ordered X-rays of Hardy's left knee. *Id.* at 16. He was advised to return at 0800 the next morning to follow up with the provider. *Id.* at 15. Hardy was given six tablets of ibuprofen (800 mg) until he could obtain the recommended over-the-counter ibuprofen for pain from the commissary. *Id.* Hardy was observed walking across the compound using the crutches but was placing some weight on the left leg after leaving health service unit. *Id.*

On September 16, 2019, the X-ray for the left knee was performed. Doc. No. 25 at 20. The impression of the X-ray revealed no acute fracture, dislocation or malalignment. *Id.* From the position of the patella, it was suspected that there was a patellar tendon rupture. *Id.* The advanced nurse practitioner reviewed the report and consulted with the onsite physician. *Id.* at 19. An urgent consultation request was written for Hardy to be sent to Regional One Health in Memphis, Tennessee for an orthopedic surgery consult and further evaluation. *Id.* at 23. The order requested a target date of September 19, 2019. *Id.* The consultation request was approved by the acting clinical director on September 17, 2019, and submitted for scheduling by NaphCare, Inc., a third-party scheduling service, on September 18, 2019. *Id.* at 25; *Cook Declaration* at ¶ 15. NaphCare, Inc. and Regional One Orthopedics scheduled an appointment date for October 10, 2019. Doc. No. 25 at 27; *Cook Declaration* at

¶ 16.

On September 18, 2019, Hardy was issued a wheelchair and placed on a medical lay-in status until he could be evaluated by an orthopedic physician. Doc. No. 25 at 30. He was also to be assigned to a lower bunk on the first floor. *Id.*

On September 23, 2019, Hardy was sent to the health services unit from his housing unit complaining of pain and swelling in his left knee. Doc. No. 25 at 32. He did not have his knee wrapped with the ace bandage. *Id.* The left knee, lower leg, and ankle were swollen. *Id.* Hardy reported that he had lost the previous ice bags that he had been given. *Id.* The treating nurse provided Hardy with a new ice bag and again instructed him again on not weight bearing and to follow the RICE treatment. *Id.* Hardy was advised to report to sick call as needed. *Id.* Hardy was given four ibuprofen tablets for pain from the commissary. *Id.*

On October 10, 2019, Hardy was transported to Regional One Health for his orthopedic consultation. Doc. No. 25 at 35. The initial exam showed Hardy was unable to extend his knee and was unable to bear weight. *Id.* Updated X-rays confirmed the patellar tendon rupture. *Id.* at 35-36. The orthopedic surgeon concluded that Hardy would need surgery to repair the patellar tendon. *Id.* The surgeon discussed the risks and benefits of the surgery with Hardy. *Id.* at 36. He was given a knee immobilizer and was again instructed to use his crutches and remain non-weight bearing. *Id.* at 36, 38.

On October 10, 2019, Hardy returned from the Regional One Orthopedics consultation with a wheelchair and a knee immobilizer to the left knee. Doc. No. 25 at 42. He was also given two crutches post-visit for non-weight bearing to the left lower extremity during transfers. *Id.* at 42-43, 45. Hardy denied any pain at that time but described pain as five out of ten with much movement. *Id.* at 42.

Soon after Hardy returned from the orthopedic surgery evaluation, BOP nursing staff observed Hardy walking through the door without his crutches and without the knee immobilizer on his knee. Doc. No. 25 at 47. Hardy was again instructed by the nurse to not bear weight to the left lower extremity, and to keep his immobilizer on his leg at all times unless bathing. *Id.* The nurse visually demonstrated an example of non-weight bearing ambulation and instructed on the proper use of the crutches. *Id.* Hardy replied, "I'm going to sue y' all anyway, so it don't matter what happen to me. I'm gonna file on you, so what." *Id.*

On October 11, 2019, a consultation request was written for orthopedic surgery with a target date of October 18, 2019, to repair the patellar tendon. Doc. No. 25 at 55. The consultation request was approved on October 11, 2019, and submitted for scheduling to NaphCare, Inc. on October 16, 2019. *Id.* at 57; *Cook Declaration* at ¶ 17. NaphCare, Inc. and Regional One Orthopedics scheduled the appointment for November 6, 2019. Doc. No. 25 at 27; *Cook Declaration* at ¶ 18.

On October 30, 2019, Hardy appeared at the medical supply line at the

pharmacy with a question about his wheelchair.  Doc. No. 25 at 59.  Hardy was not wearing his left knee immobilizer that he had been instructed to wear.  *Id.*  When asked why, Hardy said he was not wearing it because it hurt him, but he said he had not reported this concern to his provider.  *Id.*  The clinician advised Hardy to return to his housing unit and apply the knee brace as ordered previously.  *Id.*  Hardy was also instructed to report any further issues with the knee brace at medical sick call for evaluation.  *Id.*

On November 6, 2019, Hardy was escorted to Regional One Hospital for outpatient surgery to repair his left patellar tendon.  Doc. No. 25 at 64.  The surgeon's operative report noted that surgery was scheduled at a mutually agreed upon date after discussions with the patient and prison system.  *Id.*  The surgeon again discussed the risks, benefits, and alternatives of surgical treatment with Hardy, including the risk of bleeding, damage to surrounding structures, possible repeat avulsion (*i.e.*, the pulling away of tendon), possible knee adhesions, the inherent risks of anesthesia, stroke, coma, and death.  *Id.* at 64-65.  After weighing his options, Hardy chose to proceed with the surgery.  *Id.* at 65.  The operative report indicates that a "22 modifier" was added, as the patient was six weeks out from the tear and the surgery involved the dissection of traumatic scar tissue as well as fibrous adhesion.  *Id.* at 64.  A 22-modifier is a billing code used by orthopedic surgeons to bill for complex procedures under the American Medical Association's Current Procedural

Terminology in cases that the surgeon believes should be reimbursed at a higher rate to compensate for additional physician work and time. *Tomar Declaration* at ¶ 15 n.1.

On November 6, 2019, Hardy returned from Regional One Hospital following the surgery. Doc. No. 25 at 83. He rated his pain five out of ten. *Id.* Hardy was using a wheelchair for mobility, with a straight brace applied to his left leg. *Id.* at 84. Paperwork indicated Hardy needed a follow up in two-to-four weeks and instructed that Hardy was to keep his dressing in place until his follow-up visit. *Id.* Hardy was instructed to wear the brace at all times. He could, however, bear weight and bend his knee 0–40 degrees while sitting or in bed. *Id.* Hardy was instructed to follow up with the provider at 8:00 a.m. the next day, and to obtain the pain prescription Percocet in the morning pill line. *Id.* Hardy was unsure whether he had received pain medication at the hospital but stated he was sleepy and just wanted to lie down. *Id.*

On November 7, 2019, Hardy saw the advanced nurse practitioner. Doc. No. 25 at 88. Hardy appeared in his wheelchair and was able to get from the wheelchair to the exam table with crutches. *Id.* He reported stabbing pain at a level of 10. *Id.* At the appointment, all recommended post-operative medications were ordered for pain, blood clots, and constipation. *Id.* at 90. It was noted that Hardy was wearing the full leg knee immobilizer and using the wheelchair for mobilization. *Id.* Further

education was provided on the RICE therapy.  *Id.* at 91.  Hardy was again instructed to keep his dressing in place until his follow-up visit with the orthopedic physician. *Id.*  The dosage of Hardy's Percocet prescription was modified due to the medication being controlled and requiring placement on pill line.  *Id.* at 95.

In the weeks following the surgery, BOP providers closely monitored and adjusted Hardy's pain medications and blood thinners.  *Tomar Declaration* at ¶ 19; Doc. No. 25 at 102-114.  He also received regular follow-up care for his knee, education on how to improve his knee function, and physical therapy before his release in March 2021.  *Id.* at 1123-235. Hardy also had multiple follow-up appointments at Region One Orthopedic Clinic and new X-rays taken.  Doc. No. 25 at 116-120, 147-149, 183, 204-205 & 232.  An X-ray taken on November 26, 2019, showed stable patellar alignment and good patellar height.  *Id.* at 119-120.  X-rays taken on January 2, 2020, showed stable position of the patella compared to X-rays taken in November and improvement compared to X-rays taken in October.  *Id.* at 148.  X-rays taken on January 16, 2020, showed "stable alignment of his patellar avulsion compared to previous imaging."  *Id.* at 175.  On March 12, 2020, an X-ray noted "irregularity of the inferior pole left patella, likely postsurgical, with thickening of the left patellar tendon which contains multiple calcific bodies measuring up to 16 mm.  The left patella is less elevated when compared to the prior exam."  *Id.* at 183.

On November 12, 2020, Hardy complained of swelling and pain in his left knee that had begun on November 11, 2020, with no known injury.  Doc. No. 25 at 197-202.  He was seen at Regional One Orthopedic on November 19, 2020.  *Id.* at 204-205.  Hardy reported to the surgeon that he had been doing fairly well and riding stationary bikes for the past number of months, until the week before the appointment when he felt a pop and had pain and swelling. *Id.* at 204. Since that time, he reported being unable to extend his knee. *Id.* X-rays taken at the appointment revealed a high riding patella and appeared to be a patellar tendon rupture.  *Id.*  The examining resident found that Hardy had likely re-ruptured the left patellar tendon.  *Id.* at 205.

On February 17, 2021, Hardy reported slipping and falling in the shower.  *Id.* at 228.  The physician examining him noted that a new patellar rupture was unlikely but ordered X-rays to confirm.  *Id.*  The X-rays ruled out a new patellar rupture and showed Hardy's knee to be stable when compared to prior exam.  *Id.* at 233.  Diffuse thickening and multiple calcified bodies were also noted.  *Id.*  Hardy was advised to establish care with a new physician after his release and to follow instructions to keep his knee elevated and avoid bearing weight until swelling resolved.  *Id.* at 235.

### *Process for Sending Inmates out of the Secure Facility to Community Medical Facilities*

Amanda Cook, a Health Services Assistant at Forrest City FCI, provided a

declaration describing the process for sending inmates from Forrest City FCI into the community for routine, non-emergent medical appointments. *Cook Declaration* at ¶¶ 1, 6. Cook serves as Town Trip Coordinator, coordinating the outside medical appointments and hospitalizations for the approximate 3,000 inmates incarcerated at Forrest City FCI. *Id.* at ¶ 4. She explained that the first step in scheduling an outside appointment begins when a BOP provider enters a new consultation request for an outside medical appointment or procedure. *Id.* at ¶ 7. The ordering provider will include a target date in this request. *Id.* Second, all new consultation requests must be approved by the Clinical Director or the Institutional Utilization Review Committee. *Id.* at ¶ 8. MRIs and surgeries must also be approved by the Regional Medical Director. *Id.* at ¶ 9. Third, once a new consultation request has been approved, it is added to a pending scheduling list. *Id.* at ¶ 10. Each morning, the Forrest City FCI Town Trip Coordinator pulls the pending scheduling list and submits each consultation request with its target date to NaphCare, Inc., the third-party contractor that handles the actual scheduling with the outside provider. *Id.* Fourth, NaphCare, Inc. then interfaces with the outside providers to see if an appointment can be scheduled by the target date. *Id.* at ¶11. If the outside provider does not think the inmate needs to be seen as quickly as Forrest City FCI providers have requested, or if the outside provider cannot fit the inmate in for an appointment by the target date, it will notify NaphCare, Inc., which then requests from the Town

Trip Coordinator a new target date.  *Id.*  When an appointment cannot be scheduled by the target date, Forrest City FCI authorizes NaphCare, Inc. to schedule the first available appointment after the target date.  *Id.*

According to Cook, the consult request order was written September 16, 2019, with a requested target date of September 19, and was approved by the Clinical Director the following day.  Cook received the request on September 18 and she submitted it to NaphCare, Inc., on that same date.  *Id.* at ¶ 15.   Cook states that NaphCare, Inc. and Regional One Orthopedics were not able to schedule the appointment by the requested target date, and the first available date they were able to schedule the appointment was for October 10, 2019.[2]  *Id.* at ¶ 16.  She further states that the consult order for surgery was written on Friday, October 11, 2019 with a requested target date of October 18.  The surgery request was approved by the Regional Medical Director that same day.  Cook submitted the surgery request to NaphCare, Inc. on Wednesday, October 16.  According to Cook, NaphCare, Inc. and Regional One Orthopedics were unable to schedule the surgery by the requested target date, and the first available surgery date they could agree on was November

---

[2] It is unknown whether the provider did not think Hardy needed to be seen by the target date or whether the provider could not fit Hardy in for an appointment by the target date.

6, 2019.[3]  *Id.* at ¶¶ 17and 18.

## *Dr. Tomar's Medical Opinion*

In support of its motion for summary judgment, the United States submitted the affidavit of Dr. Maharaj Tomar, a physician and Clinical Director for the Forrest City FCI.  *Tomar Declaration* at ¶ 1.  According to Dr. Tomar, the care and treatment Hardy received for his left patellar avulsion injury on September 15, 2019, was within the standard of care for correctional medicine in Forrest City, Arkansas in 2019.  *Id.* at ¶ 48.  Dr. Tomar opined that the medical care providers and staff submitted timely orthopedic consultation requests for outside physician visits and surgery, and those requests were approved in a timely manner.  *Id.* at ¶ 50.

Dr. Tomar further opined that Hardy substantially exacerbated his patellar tendon injury and complicated its healing both before and after his November 6, 2019 surgery.  *Tomar Declaration* at ¶ 51.  Specifically, Dr. Tomar noted that Hardy failed to comply with weight bearing restrictions, did not use his controlled motion brace properly, and did not use his wheelchair or crutches consistently.  *Id.*  Dr. Tomar opined that Hardy's actions greatly increased the risk of pain before and after surgery on November 6, 2019, and contributed to any incomplete healing after his November 6, 2019 surgery.  *Id.*

---

[3] It is unknown whether the provider did not think Hardy required surgery on or before the target date or whether the provider could not fit Hardy in for the procedure by the target date.

# IV.  Analysis

Hardy asserts claims against the United States for medical malpractice under the FTCA.  The FTCA is a limited waiver of the United States' sovereign immunity and permits lawsuits against the United States for the torts of its employees under limited circumstances.  *See* 28 U.S.C. § 1346(b)(1); *Mader v. United States*, 654 F.3d 794, 797 (8th Cir. 2011).  In actions arising under the FTCA, courts are bound to apply the law of the state in which the acts complained of occurred.  *Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 743 (8th Cir. 2009).  It is undisputed that the medical negligence claims in Hardy's complaint address events that occurred in Arkansas at Forrest City FCI.  Thus, the Arkansas Medical Malpractice Act ("AMMA") must be applied.  See Ark. Code Ann. § 16-114-206(a).  According to the AMMA, in treating a patient, a medical care provider must possess and apply with reasonable care the degree of skill and learning ordinarily possessed and used by members of her profession in good standing, engaged in the same specialty[4] in the locality in which she practices, or in a similar locality.  *Id.*  The AMMA further provides as follows:

> In any action for medical injury, when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge, the plaintiff shall have the burden of proving:

---

[4] The Arkansas Supreme Court struck down the portion of the AMMA requiring expert testimony to be given by a medical care provider of the same specialty as the defendant.  *See Broussard v. St. Edward Mercy Health System, Inc.*, 2012 Ark. 14.

> (1) By means of expert testimony provided only by a medical care provider of the same specialty as the defendant, the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he or she practices or in a similar locality;
>
> (2) By means of expert testimony provided only by a medical care provider of the same specialty as the defendant that the medical care provider failed to act in accordance with that standard.

Ark. Code Ann. § 16-114—206(a).  Thus, expert testimony is required "when the standard of care is not within the jury's common knowledge and when an expert is needed to help the jury decide the issue of negligence."  *Robbins v. Johnson*, 367 Ark. 506, 512, 241 S.W.2d 747, 751 (2006).  *See also Reagan v. City of Piggott*, 305 Ark. 77, 805 S.W.2d (1991).

The AMMA requires expert testimony to support Hardy's malpractice claim, and he has not produced such testimony.[5]  *See* Doc. No. 21-3, Answer to Interrogatory No. 3; Doc. No. 21-4, Responses to Request for Admission, Nos. 1 – 3.  This failure is fatal, and as a result, the United States is entitled to summary judgment on Hardy's FTCA claim.  This decision is supported by other decisions of this Court, by decisions of the Eighth Circuit Court of Appeals, and by the Supreme Court of Arkansas.  When the requisite expert testimony has not been produced "then the defendant has demonstrated that no genuine issues of material fact exist for

---

[5] The discovery deadline in this matter expired on February 17, 2022.  Doc. No. 16.

presentation to a jury, and the defendant is entitled to judgment as a matter of law."
*Eaton v. United States of America*, 2016 WL 1029485, No. 2:14-cv-00116, slip op.
at 2 (E.D. Ark. March 15, 2016).  *See also Rueben v. United States of America*, 2014
WL 5460574, No. 2:13-cv-00033 (E.D. Ark. Oct. 27, 2014); *Bellecourt v. United
States*, 994 F.2d 427 (8th Cir. 1993); *Robson v. Tinnin*, 322 Ark. 605 (1995); and
*Reagan v. City of Piggott*, 305 Ark. 77 (1991).

The AMMA provides a narrow exception to the need for expert testimony –
when the alleged negligence lies within a jury's comprehension as a matter of
common knowledge.  The medical issues about which Hardy complains involve
whether the outpatient consultation and surgery appointments were scheduled
quickly enough, and whether a delay in consultation and surgery resulted in
additional injury to Hardy, including poor healing and likelihood of reinjury.  These
issues are not matters of common knowledge which would obviate the need for
expert testimony.  This finding is consistent with the above-cited cases, all of which
found the medical conditions were not a matter of common knowledge.  See *Eaton*
(need for tooth extraction and delay in treatment); *Rueben* (failure to diagnose
cellulitis); *Bellecourt* (failure to diagnose heart attack); *Robson* (failure to diagnose
and treat fractured tooth); and *Reagan* (misdiagnosis of appendicitis).  *Cf. Davis v.
Kemp*, 252 Ark. 925 (1972) (a surgeon's failure to sterilize his instruments or failure
to remove a sponge from an incision before closing it cited as examples of matters

of common knowledge).  The effect of any delay in surgically repairing Hardy's patellar tendon is a complex medical issue, not a matter of common knowledge, and the narrow statutory exception does not remove his burden to provide expert testimony.

Additionally, Hardy has not specifically requested that the Court appoint him a medical expert.  Had he done so, the Court finds that the circumstances would not warrant such an appointment.  First, Hardy has paid the required filing fees and has not established that he is indigent.  *See* Doc. No. 4.  Further, even if he could show he is unable to pay for an expert, 28 U.S.C. § 1915 does not address or authorize the payment of federal money for witness fees on behalf of an indigent party in civil litigation.  *See, e.g., United States v. Means*, 741 F.2d 1053 (8th Cir. 1984).  The Eighth Circuit in *Means*, however, concluded that a "district court may order the United States, as a party [to litigation], to advance the fees and expenses of lay and expert witnesses **called by the court** . . ."  741 F.2d at 1059 (relying on Fed. R. Evid. 614(a) and 706(b), Fed. R. Civ. P. 54(d), and 28 U.S.C. §§ 1920 and 2412) (emphasis added).  In so finding, the Court strongly emphasized that such "discretionary power is to be exercised only under compelling circumstances."[6]  *Id.*

---

[6] In *Means*, the United States was the plaintiff, and had initially paid fees for defense pretrial witnesses on several occasions.  At trial, however, the United States refused to pay for defense trial witnesses.  Under the specific circumstances, the court found that fairness "in interactions between citizens and the government" justified the exercise of its discretion.  *Id.*

In a rare instance where the Eighth Circuit exercised its discretion to find an indigent inmate entitled to appointment of a medical expert, the Court noted compelling circumstances supporting the decision.  *See Spann v. Roper*, 453 F.3d 1007 (8th Cir. 2006) (*per curiam*).  In *Spann*, a case filed pursuant to 42 U.S.C. § 1983, the defendant nurse left plaintiff unattended in a cell for three hours after becoming aware she had administered a medication overdose.  The district court granted summary judgment because the plaintiff failed to offer medical evidence in support of causation.  The Eighth Circuit reversed, finding sufficient evidence to support a finding of deliberate indifference, and finding compelling circumstances existed to support the appointment of a medical expert.  453 F.3d at 1009.

Most cases do not present the compelling circumstances that existed in *Spann*. *See, e.g., Watt v. United States*, 2017 WL 4931708 (E.D. Ark. 2017) (plaintiff regularly evaluated by medical providers and was being treated; no compelling circumstances); *Eaton v. United States*, 2016 WL 1029485 (E.D. Ark. 2016) (plaintiff did not report pain or submit sick call requests; no compelling circumstances); *Filpo v. United States*, 2016 WL 7115941 (E.D. Ark. 2016) (plaintiff treated on numerous occasions, was sent to specialists, and expert opined that care and treatment were within standard of care; no compelling circumstances).

The discretionary appointment of a medical expert in an inmate's FTCA medical malpractice claim was considered by United States Chief District Judge

D.P. Marshall Jr. in *Rueben v. United States*, Case No. 2:13cv00033-DPM, 2014 WL 5460574 (E.D. Ark. 2014). There, Magistrate Judge Jerome Kearney recommended, and Judge Marshall adopted, a finding that the plaintiff inmate's request for appointment of an expert witness be denied because there were no compelling circumstances to justify such an appointment. The finding of no compelling circumstances was based on evidence that the inmate was treated numerous times by the defendants; the defendants consistently treated him for the medical condition in issue, offering medications and ordering diagnostic tests; and the defendants arranged for the inmate's transport to a local hospital for more testing and evaluation.

The facts in Hardy's case are distinguishable from *Means* and *Spann*, and much more similar to the facts of *Reuben, Watt, Eaton,* and *Filpo.* Hardy received immediate evaluation and treatment for his knee injury at the Forrest City FCI. An X-ray was taken and an urgent request for evaluation by a specialist was submitted promptly. Once he was seen by a specialist and surgery recommended, a surgery request was submitted just a few days later. The appointments for the consult and the surgery were scheduled by the third-party scheduling administrator NaphCare, Inc. and Regional One Orthopedics.[7] Additionally, while his knee was being treated

---

[7] According to the *Cook Declaration*, the dates scheduled were the first available dates that NaphCare, Inc. and Regional One Orthopedics were able to agree on. *See Cook Declaration* at ¶¶ 16, 18.

and he awaited surgery, Hardy was provided with crutches, a wheelchair, bandages, and a knee immobilizer, and he was also instructed on how to care for his knee while awaiting treatment.  He was given medical idle status and athletic restrictions and assigned to a lower cell and lower bunk.  Nevertheless, his medical records show that Hardy did not always abide by these instructions and continued to put weight on his leg during this time.  He was given medication for pain.  Finally, the United States provided sworn testimony of an expert who opined that the care and treatment provided at the Forrest City FCI were within the standard of care.  Under these circumstances, the Court finds that there are no compelling circumstances present that would support the appointment of an expert for the plaintiff.

In summary, Hardy alleges negligence by the medical providers in an area which is beyond the common knowledge of a juror.  The AMMA requires Hardy to provide an affidavit or declaration of an expert to support his claim.  He has not complied with this requirement.  And compelling circumstances do not exist which would justify the appointment of an expert.  As a result, the Court recommends that the United States' motion for summary judgment on Hardy's FTCA claims be granted.

## V.   Conclusion

For the reasons stated herein, the undersigned recommends that the United States' motion for summary judgment (Doc. No. 19) be granted, and Hardy's complaint be dismissed with prejudice.

SO RECOMMENDED this 25th day of January, 2023.


_____
UNITED STATES MAGISTRATE JUDGE